UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

MARSHA LAFOUNTAIN, Individually and as Personal
Representative for the Estate of Thomas Lafountain, deceased,

      Plaintiff,

v.

CARNIVAL CORPORATION,
RICO SUN TOURS, INC. d/b/a RST, and
XYZ CORPORATION(S),

      Defendants.

_____/

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

The Plaintiff sues Defendants and alleges:

**PRELIMINARY ALLEGATIONS**

1.  The Plaintiff, MARSHA LAFOUNTAIN, is a citizen and resident of the State of Massachusetts.  The Plaintiff brings this action in her individual capacity, as well as in her capacity as Personal Representative for the Estate of Thomas Lafountain, deceased (hereinafter the "Decedent"), who, when alive, was also a citizen and resident of the State of Massachusetts.

2.  Defendant, CARNIVAL CORPORATION (hereinafter "Carnival"), is a corporation incorporated under the laws of Panama having its principal place of business in Miami, Florida.

3.  Defendant, RICO SUN TOURS, INC. d/b/a RST, upon information and belief, is a corporation incorporated in the Commonwealth of Puerto Rico.

4.  Defendant(s), XYZ CORPORATION(S), is included to represent the owner(s) and/or operator(s) of the subject excursion, insofar as such entity has a different name than the name included herein (i.e., RICO SUN TOURS, INC. d/b/a RST).  In the event discovery reveals

different and/or additional entities contributed to the ownership, operation, and/or management of the subject excursion, the legal names of the entities will be substituted for XYZ CORPORATION(S).   Defendants, RICO SUN TOURS, INC. d/b/a RST and XYZ CORPORATION(S) are hereinafter collectively referred to as the "Excursion Entities" in a manner so as to retain each Defendant's separate and individual liability in the event said Defendants are severed.

5.   The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.  In the alternative, if diversity jurisdiction does not apply, then this matter falls under the admiralty and maritime jurisdiction of this Court.

6.   The causes of action asserted in this Complaint arise under the General Maritime Law of the United States and state law, where there is no conflict with General Maritime Law.

7.   Defendants, at all times material hereto, personally or through an agent:

   a.   Operated, conducted, engaged in or carried on a joint business venture in this state and/or county or had an office or agency in this state and/or county;

   b.   Were engaged in substantial business activity within this state;

   c.   Operated vessels in the waters of this state;

   d.   Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193;

   e.   The acts of Defendants set out in this Complaint occurred in whole or in part in this county and/or state.

   f.   Defendants were engaged in the business of providing to the public and to the Plaintiff in particular, for compensation, vacation cruises aboard their vessel.

8.   Defendants are subject to the jurisdiction of the Courts of this state.

### The Excursion Entities' activities in Florida satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a).

9.   At all times material hereto, the activities of Carnival and the Excursion Entities in Florida satisfy the specific jurisdiction provision of Florida Statute § 48.193(1)(a), by acts that

include, but are not limited to, (a) reaching out to Florida-based cruise lines, insurers, cruise industry associates, and/or premium financing companies for purposes of operating, conducting, engaging in, and/or carrying on a business and/or business venture in this state; (b) contractually agreeing to indemnify Florida-based cruise lines (entities mostly located in Miami and Fort Lauderdale) for any harm resulting to cruise passengers, thereby insuring a "person, property, or risk located within this state."; and/or (c) establishing a joint business venture with Carnival, which joint venture was based in Miami, Florida, U.S.A., to own, manage, fund, sponsor, advertise, market and/or operate the subject excursion.

### The Excursion Entities' contract with Carnival meets all requirements to satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a)(9).

10. At all times material hereto, the Excursion Entities entered into a contract with Carnival concerning the subject excursion, which (a) contains a choice-of-law clause designating Florida law as the governing law; (b) contains a provision whereby the Excursion Entities agree to submit to the exclusive jurisdiction of the courts of Florida; (c) involves consideration of not less than $250,000 or relate to an obligation arising out of a transaction involving in the aggregate not less than $250,000; (d) does not violate the U.S. Constitution; and (e) has at least one party of the contract that is a resident of Florida or incorporated under the laws of Florida.  Therefore, the contract between Carnival and the Excursion Entities meets all requirements to satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a)(9).

### The Excursion Entities' continuous and systematic general business contacts with Florida satisfy a finding of general jurisdiction under Florida Statute § 48.193(2).

11. At all times material hereto, the Excursion Entities have engaged in substantial and not isolated activity within this state, including, but not limited to: (a) reaching out to cruise lines in Florida and establishing long-term partnerships with them; (b) deriving a substantial portion of their revenues from their business with Florida-based cruise lines; (c) periodically traveling to

Miami to meet with cruise line executives for purposes of maintaining the business relationships and/or obtaining new business; (d) procuring insurance through companies in Florida; (e) maintaining Florida entities as "Agents of Record" for insurance purposes; (f) agreeing to insure and indemnify entities in Florida; (g) signing premium financing agreements with Florida entities in order to obtain a loan to pay for liability insurance premiums; (h) buying parts and/or supplies from Florida-based suppliers to operate their excursions; (i) signing powers of attorney and/or appointing attorneys-in-fact in Florida to carry out their Florida operations; (j) participating in cruise industry trade shows in Miami (e.g., Sea trade); and/or (k) maintaining active membership in Florida Caribbean Cruise Association, based in Florida.

12. At all times material hereto, the Excursion Entities have been in the business of providing excursions to cruise line passengers in Mexico through Florida-based cruise lines, including Carnival, Royal Caribbean, Celebrity and/or NCL.  In entering into contracts with these Florida-based cruise lines, the Excursion Entities agree to the exclusive jurisdiction of courts in Florida.   Additionally, by being under contract with the Florida-based cruise lines, the Excursion Entities receive the benefit of the cruise lines' advertising and promotional efforts.

13. At all times material hereto, the Excursion Entities' arrangement with the Florida-based cruise lines and the circumstances of this case are markedly different than those at issue in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).  Herein, unlike *Daimler*, the Plaintiff is suing a Florida-based cruise line (Carnival) for injuries sustained while participating in an excursion operated by agents of the cruise line (the Excursion Entities) -- agents set up almost exclusively to do business with cruise lines (a majority of which are based in Florida).  Further unlike *Daimler*, Carnival is "at home" in this jurisdiction because Carnival maintains its principal place of business in Florida. Thus, under *Daimler*, the Excursion Entities are also deemed "at home" in this jurisdiction by their direct and indirect contacts with Florida (through the Florida-based cruise lines).

**The Excursion Entities' activities in Florida satisfy
a finding of jurisdiction under Fed. R. Civ. P. 4(k).**

14. At all times material hereto, the Excursion Entities are also subject to jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) because (a) the instant maritime tort claims arise under federal law; (b) the Excursion Entities are not subject to jurisdiction in any state's courts of general jurisdiction; and (c) exercising jurisdiction over the Excursion Entities is consistent with the United States Constitution and laws based on the Excursion Entities' minimum contacts with the United States as a whole such that the maintenance of this lawsuit does not offend traditional notions of fair play and substantial justice.  These minimum contacts are set forth in the above allegations, and include, but are not limited to, the Excursion Entities' location and operation in the United States, as well as marketing, promoting, and selling tickets for its excursions in the United States directly and/or through cruise lines as their agents located all over the United States.

## FACTS COMMON TO ALL COUNTS

15. At all times material hereto, Carnival owned, operated, managed, maintained and/or controlled the vessel, *Carnival Mardi Gras*.

16. At all times material hereto, the Excursion Entities owned and/or operated the subject excursion, which was offered, arranged for, sponsored, recommended, marketed, sold, co-operated and/or managed by Carnival.

17. On or about October 12, 2021, Plaintiff and the Decedent were paying passengers aboard the *Carnival Mardi Gras*, which Carnival operated in navigable waters.

**Promotional Material and Statements Concerning
Shore Excursions Generally and the Subject Excursion Specifically**

18. First, after booking the subject cruise, Carnival sent Plaintiff and the Decedent promotional material, which provided information and descriptions of shore excursions, including the subject excursion.

19. Second, Carnival also had promotional materials at its shore excursion desk aboard the cruise ship and/or other areas of the ship with information and descriptions of shore excursions, including the subject excursion.  Tickets for shore excursions, including the subject excursion, were also available for sale on Carnival's shore excursion desk aboard the cruise ship.

20. Third, Plaintiff and the Decedent visited the shore excursion desk aboard the *Carnival Mardi Gras* on or about October 10, 2021, and prior to deciding to participate in the subject excursion. At the shore excursion desk, Plaintiff and the Decedent asked a Carnival shore excursion agent about Carnival's shore excursions, generally, and the subject excursion, specifically.

21. On or about October 10, 2021 aboard the *Carnival Mardi Gras*, Carnival's agent at the shore excursion desk represented to Plaintiff and the Decedent the following about the subject excursion:

    a.  The excursion was "easy"

    b.  The excursion was "safe"

    c.  "This is just our beach trip excursion"

    d.  "We have people on scene to look out for you"

22. When Carnival's shore excursion agent said "we" and "our" to Plaintiff and the Decedent, they understood "we" and "our" to mean only Carnival. Plaintiff and the Decedent interpreted "we" and "our" as such because Plaintiff and the Decedent specifically told Carnival's shore excursion agent that they wanted to purchase a shore excursion that was operated by Carnival because they were concerned about shore excursions operated by unknown locals in Puerto Rica; and instead, wanted a shore excursion that was operated by a known U.S. company, like Carnival. In response to these expressed concerns from Plaintiff and the Decedent, Carnival's shore excursion desk agent made the representations outlined in the above paragraph. As such, Plaintiff

and the Decedent relied on Carnival's agent at the shore excursion desk when the agent represented to them that the subject shore excursion was offered and operated by Carnival, including the specific representations outlined above.

23. Further, the information and/or material Carnival made available and/or distributed to the Plaintiff and the Decedent represented that the excursions, including the subject excursion, were operated and/or overseen by Carnival and/or they were safe.  For example:

  a.  Carnival's website publicly described the shore excursions in proprietary language, including, but not limited to, "our excursions."  Similarly, page 2 of Carnival's shore excursion brochure also used proprietary language referring to shore excursion as "our excursions" and directing passengers to "our experts at the Shore Excursion Desk by the main lobby."

  b.  Carnival represented in its website that it "take[s] care of all the details and wait[s] for all Carnival excursions to return before departing."

  c.  Carnival's website stated that Carnival "hand selected the best local providers at every port of call," and Carnival recommended that passengers not engage in excursions, tours or activities that were not sold through Carnival.  Additionally, page 2 of Carnival's shore excursion brochure stated that Carnival "constantly upgrades the shore excursion packages offered in each port of call in order to make sure the best possible selections are made available."

  d.  Carnival represented in its promotional material (including its website) that its excursion providers are "reliable [and] reputable," that all shore excursions were "guided," and that Carnival selects its excursion providers because they have the "best reputation" in their respective ports.

  e.  Carnival's website stated that passengers should book the excursions sold through Carnival because the providers are "required to carry insurance," without providing any details as to the adequacy or limits of such insurance.

24. For example, the photographs below depict the promotional material and information referenced herein, which were made available on Carnival's website:

**Carnival's Shore Excursions Homepage**
**([https://www.carnival.com/shore-excursions](https://www.carnival.com/shore-excursions))**



**Carnival's Shore Excursion FAQs**
**([https://help.carnival.com/app/answers/detail/a_id/2866/~/shore-excursion-faqs](https://help.carnival.com/app/answers/detail/a_id/2866/~/shore-excursion-faqs))**

**When can I book shore excursions?**
Shore excursions may be booked online prior to sailing up until the Pre-Sail cut-off time, 11:30pm ET the evening prior to the cruise departure. Excursions for 2018 sail dates are available for purchase. For 2019 sail dates, please check back in late Spring of 2018.

After the online Pre-Sail, the remaining inventory will be available on the departure day onboard the ship. Due to availability, it is strongly suggested that guests take advantage of ordering their shore excursions in advance, online, in order to avoid disappointment once on board.

To browse our shore excursions, click here.

**Do I have to book a shore excursion through Carnival or can I go off on my own?**
You are not obligated to book shore excursions through Carnival in order to leave the ship. Public transportation is available at each port. We suggest you visit your local library, bookstore or a pertinent website to determine where you would like to go.

Carnival does not offer any alternatives from the established shore excursion program. All shore excursions sold through Carnival are coordinated with reputable tour operators and include all of the most popular sites of interest.

One of the many benefits of booking excursions through Carnival is a guarantee that the ship will remain in port until all guests are back onboard. Carnival will not be aware of shore excursions that are booked independently. Also, keep in mind that some ports have visa requirements that may prevent you from venturing off on your own.

**Is it possible to go shopping and participate in an excursion while in port?**
Yes. Many of our excursions are only a few hours in duration, leaving you with plenty of time in most ports for shopping, sightseeing or even participating in another tour. Also, many of our longer excursions include a shopping stop.

**Why Book with Carnival for Shore Excursions?**
Reliable and Reputable. Yes, you have to take all of these into account, and we are happy to say that Carnival's shore excursion providers* are reliable, reputable, and required to carry insurance. Carnival has chosen the selected providers because these providers enjoy the best reputation in their respective ports. These shore excursion providers know that Carnival's guests expect a positive, fun-filled excursion.

**Are the shore excursions guided?**
Yes. All of the shore excursions sold through Carnival include an English-speaking guide except where otherwise noted in the tour description.

**What are the guidelines for writing tour reviews?**
We want to publish your review, so please:

▸ Keep your review focused on the shore excursion

▸ Refrain from mentioning competitors, prices, promotions or time sensitive details

▸ Do not include any personally identifiable information, such as full names

▸ Avoid writing about customer service; contact us instead if you have issues requiring immediate attention

▸ Reviews should be written by the guest who took the shore excursion.

▸ Please do not submit a review if you have not taken the shore excursion.

25. Among Carnival's promotional material concerning shore excursions, including the subject excursion, Carnival's website contained reviews for each excursion, which were posted by passengers. Notably, however, Carnival controls the information passengers disseminate about the excursions. For instance, as included in the above photograph, Carnival's website directs passengers to refrain from mentioning competitors, prices, and promotions, and to avoid writing about customer service issues related to the excursion. Carnival also alters and/or deletes passengers' reviews that contain complaints and/or information concerning safety concerns and/or prior incidents that have occurred while participating in the excursion. As a result, when passengers (like the Plaintiff and the Decedent) read the reviews on Carnival's website, they are under the impression that the excursion is safe because the vast majority (if not all) of the reviews Carnival chooses to leave on the website are positive, without any complaints about customer service, negative experiences and/or prior incidents.

26. Further, Carnival's promotional material and information did not contain adequate warnings and/or reviews from other passengers about customer service, negative experiences and/or prior incidents.

27. With regard to the subject excursion specifically, Carnival's promotional material and information did not require or recommend any particular level of experience to participate in the excursion. In fact, Carnival's promotional material and shore excursion agent represented that the activity level for the subject excursion was "easy". However, and in reality, the subject excursion was not easy because excursion participants were invited to swim in the ocean water as part of the excursion, and in doing so, the excursion participants encountered dangerous current.

28. At all times material hereto, Carnival and/or the Excursion Entities knew or should have known about the dangerous current before the incident. Specifically, the subject excursion occurred during hurricane season (i.e., October 2021) and when it was known that the beaches near San Juan (i.e., where the subject excursion took place), experience strong currents that had previously killed and/or threatened the lives of swimmers. In fact, the beaches in close proximity to San Juan, Puerto Rico, where the subject excursion took place, were well known to experience dangerous rip currents in the months before and after the subject excursion:



In addition to the death of the 12-year-old, other incidents were reported over the weekend of people getting swept away by ocean currents in Fajardo, Aguadilla, Manatí, and San Juan.
Image via NWS San Juan.

https://theamericanonews.com/floricua/2022/02/22/officials-demand-lifeguards-and-warning-signs-at-beaches-after-drowning-deaths-in-puerto-rico/

29. Further to that point, in the months leading up to the subject incident, strong public concern was voiced over news media outlets concerning the dangerousness of the subject beach, and demands were publicly made for the Puerto Rican government to provide lifeguards for the subject beach to prevent swimmers' injuries and/or deaths. *See id.*

30. Carnival and the Excursion Entities knew and/or should have known that the beach it would take Plaintiff and the Decedent for the subject excursion would present dangerously strong current because, prior to the subject incident and pursuant to Carnival's own policies and procedures, managerial employees of Carnival's shoreside headquarters, the Captain of the vessel, the shore excursion providers and other managerial shipboard employees (i.e. Director of Shore Excursions) would set up telephonic meetings and/or exchange emails before a Carnival cruise

vessel calls at any specific port. One purpose of the pre-port stop meeting and/or information exchange is to discuss hazardous and/or dangerous conditions that threaten the vessel and/or passengers during the port stop and/or shore excursions. Had Carnival and/or the Excursion Entities properly conducted this meeting before the subject incident, Carnival and/or the Excursion Entities would have learned of and/or discussed this potential rip current hazard in the area of the subject beach.  Therefore, Carnival and/or the Excursion Entities knew or should have known that the current in the subject area would be dangerous at the time of the subject excursion. This meeting also would have given Carnival and/or the Excursion Entities an opportunity to cancel the subject excursion, given the strength of the current at the time of the subject excursion.  In fact, as alleged in paragraph 38 below, the Excursion Entities had actual knowledge of the strong rip current in the ocean and beach area of the subject excursion on the day of the subject excursion (October 12, 2021).  As such, the Excursion Entities did or should have warned Carnival of same so that Carnival could have made the decision to cancel the subject excursion, modify it and/or provide appropriate warnings to Plaintiff and the Decedent, so that they could make an informed decision as to whether or not to participate in the excursion.

31. While the above information was unknown to Plaintiff and the Decedent, the Plaintiff and the Decedent reviewed the foregoing promotional information and/or material from Carnival, including Carnival's website and brochures, concerning excursions generally and the subject excursion.  Specifically, on or about September 18, 2021, Plaintiff reviewed Carnival's website prior to boarding the vessel.  Then, shortly after boarding the vessel on or about October 10, 2021, Plaintiff and the Decedent reviewed Carnival's brochures and promotional material available at the shore excursion desk aboard the vessel, talked to Carnival's shore excursion desk agent, and then, based upon the representations outlined above, purchased the subject excursion and decided to participate in the subject excursion on October 10, 2021 and while aboard the vessel.

32. The information and/or material Carnival made available and/or distributed to passengers concerning shore excursions, including the Plaintiff and the Decedent concerning the subject excursion, was based on the description and/or information provided to Carnival by the Excursion Entities and/or by Carnival's inspections and/or approval of the subject excursion and/or of the Excursion Entities. Accordingly, Defendants undertook a duty to accurately advise passengers, including the Plaintiff, concerning the subject excursion in order to obtain a profit for Defendants, and Defendants were required to execute that duty utilizing reasonable care under the circumstances.

### Subject Incident

33. Relying on the safety and reputability of Carnival as well as Carnival's representations regarding its shore excursions, including the subject excursion, Plaintiff and the Decedent purchased tickets for the subject excursion directly from Carnival and decided to participate in the subject excursion while aboard the cruise vessel after speaking with Carnival's shore excursion agent on October 10, 2021.  The Plaintiff and the Decedent obtained all of the information regarding the subject excursion from Carnival and made all of the reservation arrangements for the subject excursion exclusively with Carnival.  In turn, Carnival received a portion of Plaintiff and the Decedent's ticket price for the subject excursion.

34. The Plaintiff and the Decedent reviewed Carnival's information and/or material concerning the subject excursion and relied upon Carnival's representations exclusively and to Plaintiff and the Decedent's detriment in deciding to purchase the subject excursion from Carnival and to participate in same during the cruise aboard the *Carnival Mardi Gras*.

35. Based upon Carnival's information and/or material concerning the subject excursion, Plaintiff and the Decedent reasonably understood that Carnival conducted regular inspections of the facilities, vessel(s), operations and operators of the subject excursion to ensure that they were

reasonably safe, and Plaintiff and the Decedent relied upon such understanding to Plaintiff and the Decedent's detriment in deciding to purchase the subject excursion from Carnival and to participate in same during Plaintiff's cruise aboard the *Carnival Mardi Gras*.

36. On or about October 12, 2021, as part of the cruise aboard the *Carnival Mardi Gras*, Plaintiff and the Decedent participated in the subject excursion in Puerto Rico. This excursion was arranged for, sponsored, recommended, operated, marketed and/or sold by Carnival as part of the cruise aboard the *Carnival Mardi gras* vessel.  Unbeknownst to Plaintiff and the Decedent at the time, the excursion was operated by the Excursion Entities.

37. The subject excursion consisted of a beach trip and lunch in which shore excursion participants were given the opportunity to swim in the ocean water near San Juan, Puerto Rico.

38. When Plaintiff and the Decedent got to the beach, the Excursion Entities employees told them, "Don't swim past the reef because the current is dangerously strong there."  There were no lifeguards on the beach.  There were only two Excursion Entity employees on the scene for approximately 50 shore excursion participants. The Excursion Entities did not provide shore excursion participants, including Plaintiff or the Decedent, life vests.

39. Within thirty (30) minutes of swimming in the ocean water, and not past the reef, Plaintiff and the Decedent were swept into a dangerous rip current. The rip current overpowered the Plaintiff and Decedent, and both the Plaintiff and the Decedent ingested water and struggled to survive in the dangerous rip current. Ultimately the Decedent ingested too much water and drowned. Within twenty (20) minutes thereafter, Plaintiff and the Decedent were rescued to the shore by other shore excursion participants.

40. The Excursion Entities failed to have or timely enact an emergency response plan. For example, no one on scene from the Excursion Entities knew how to provide CPR, there was no AED on scene, and it took over one hour following the Decedent's rescue to shore for an

ambulance to appear on scene. By the time the ambulance appeared on scene, the Decedent had died.

41. This tragedy occurred for reasons that include, but are not limited to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.

42. As a result of the incident described above, and as a direct result of the negligence of Carnival and the Excursion Entities, the Decedent died, and Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression, with physical manifestations, which include, but are not limited to, gastrointestinal pain and uncomfortable discharge, poor sleep, and lack of appetite.

43. The Plaintiff suffered this emotional distress with accompanying physical manifestations due to her direct experience swimming in the dangerous ocean water that was fraught with strong currents in which she struggled to swim, as well as personally witnessing the Decedent's slow and agonizing death caused by drowning and Defendants' poor rescue response.

**Carnival's Notice of the Dangerous Excursion and/or Incompetent Providers**

44. The subject excursion was not competently operated by properly trained and/or supervised persons, and/or it was unreasonably hazardous for reasons that include, but are not limited to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.

45. The incompetence and/or hazardous conditions of the excursion should have been discovered by Carnival and/or the Excursion Entities before the incident had Carnival and/or the Excursion Entities properly evaluated the weather and sea conditions of the subject excursion and/or conducted an adequate inspection of the subject excursion operation to ensure it was reasonably safe before repeatedly recommending the excursion to its passengers, including Plaintiff, to the exclusion of other excursions not offered by Carnival.

46. For example, prior to the subject incident and pursuant to Carnival's own policies and procedures, managerial employees of Carnival's shoreside headquarters, the Captain of the vessel, the shore excursion providers and other managerial shipboard employees (i.e. Director of Shore Excursions) meet before a Carnival cruise vessel calls at any specific port. One purpose of the meeting is to discuss hazardous and/or dangerous conditions that threaten the vessel and/or passengers during the port stop and/or shore excursions. Had Carnival and/or the Excursion Entities properly conducted this meeting before the subject incident, Carnival and/or the Excursion Entities would have learned of and/or discussed this potential rip current hazard in the area of the subject beach.  Therefore, Carnival and/or the Excursion Entities knew or should have known that the current in the subject area would be dangerous at the time of the subject excursion. This meeting also would have given Carnival and/or the Excursion Entities an opportunity to cancel the subject excursion, given the strength of the current at the time of the subject excursion.

47. Similarly, prior to the subject incident, it was the Excursion Entities' practice to monitor weather and sea conditions to determine the safety of shore excursion participants, and to report any potential hazards to Carnival before the excursion takes place. Had the Excursion Entities, which are based in Puerto Rico, reasonably monitored the weather and sea conditions in Puerto Rico before the subject incident, they too would have appreciated the severity of the current and/or lack of lifeguards at the beach, of which Carnival and the Excursion Entities should have

reasonably anticipated would cause adverse weather and current conditions and unreasonable danger for shore excursion participants at the scene and on the day of the subject incident.

48. In addition, before the subject incident, Carnival was or should have been on notice that the subject excursion was dangerous and/or not suitable for passengers due to other passengers being similarly injured as a result of the same or similar dangerous conditions alleged herein on similar excursion(s) provided by Carnival, its local shore excursion operators and/or operated by the Excursion Entities, including, but not limited to, the following:

a. *Nichols v. Carnival Corp.*, 1:19-CV-20836-UU, 2019 WL 11556754, at *1 (S.D. Fla. June 21, 2019) (action stemming from the decedent's drowning during shore excursion offered and provided by Carnival; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate look-outs);

b. *Pucci v. Carnival Corp.*, 146 F. Supp. 3d 1281 (S.D. Fla. 2015) (husband and son of cruise ship passenger brought action against Carnival arising from passenger's drowning while on shore excursion; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate instructions);

c. *Smith v. Carnival Corp.*, 584 F. Supp. 2d 1343, 1345 (S.D. Fla. 2008) (plaintiff brought wrongful death and related claims against Carnival and shore excursion company for the drowning of the decedent during an excursion in the Cayman Islands; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate instructions);

d. *Joseph v. Carnival Corp.*, 2011 WL 3022555 (S.D. Fla. 2011) (plaintiff claiming negligence against Carnival for providing and sponsoring a shore excursion in which the shore excursion operator did not provide reasonably safe instructions or look-out);

e. *Monaghan v. Carnival Corp.*, 07-20492-CIV, 2007 WL 9709736, at *1 (S.D. Fla. June 12, 2007) (alleging negligence against Carnival for the wrongful death of the passenger who died allegedly participating in an excursion advertised and operated by Carnival; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate instructions, gear or lookout);

f. *Noguera, et al. v. Rico Sun Tours, Inc., et al,*, Case No. 16-cv-02128-MEL (D.P.R. 2016) (plaintiffs filed suit for injuries sustained from an excursion arranged by the same excursion entity involved herein, Rico Sun Tours, Inc.).

49. Further, before Plaintiff's incident, Carnival was or should have been on notice that the excursion was not reasonably safe for passengers.  This notice was or should have been acquired through Carnival's initial approval process and/or its yearly inspections of the subject excursion.

50. Specifically, before offering excursions to passengers, the excursions and/or the excursion operators are subject to Carnival's approval pursuant to policies and procedures promulgated by Carnival.  This is a duty undertaken by Carnival, in part, so that it may make the aforementioned representations concerning the subject excursion to its passengers in an effort to generate a profit for Carnival.   Accordingly, Carnival is required to execute this duty with reasonable care under the circumstances.

51. During the excursion approval process, Carnival is supposed to verify whether the operator is qualified and competent to operate the subject excursion and provide the excursion. This investigation includes Carnival understanding the layout and natural conditions in the area where the subject excursion is to take place; actually identifying the equipment offered by the Excursion Entities (ie. life vests) – or lack thereof; and identifying the Excursion Entities employees on scene for the subject excursion. Had Carnival done this inspection properly, and for example, Carnival would have learned that the rip current in the area where the Excursion Entities took Carnival's passengers was dangerously strong; the Excursion Entities did not provide life vests to shore excursion participants; the ratio of Excursion Entities employees compared to passenger participants, for look-out purposes, was inadequate (i.e. a 1:25 ratio); and there were no lifeguards on the beach.

52. The excursion operators also provide Carnival details pertaining to the excursion, including, but not limited to, the location, a description, restrictions, and/or participation levels for the excursion; and in turn, Carnival independently investigates and verifies the excursion and natural conditions. Had Carnival reasonably investigated, it would have learned that the shore

excursion location naturally encounters strong currents, especially during the summer hurricane season.

53. Part of the approval process also entails Carnival's representatives personally inspecting and participating in the excursion being proposed, including the vessel and operations, under similar conditions to which the passenger participants are to be exposed. Had Carnival inspected the excursion during the summer-to-October hurricane season, Carnival would have learned of the naturally strong current in the area of the subject excursion during the summer and October months; the lack of life vests used during the subject excursion; the lack of lifeguards on scene at the beach; and the dangerously inadequate employee to passenger ration (1:25) that did not provide sufficient look out for shore excursion participants.

54. Accordingly, taking the subject excursion under the same or similar circumstances as the subject incident did or should have revealed that the subject excursion was dangerous and/or not suitable for passengers due to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.

55. Moreover, once an excursion is approved and accepted by Carnival, Carnival sends excursion operators standards, policies, and/or procedures that the operators must adhere to while Carnival is offering their excursions to its passengers. Additionally, the excursion operators are subject to yearly inspections and/or approval by Carnival, wherein Carnival is supposed to conduct site inspections of the excursion as well as the vessel and/or operations of the excursion. The yearly inspections and/or approval process also requires excursion operators to submit yearly "bids" and/or reports to Carnival, wherein the operators disclose the details of incidents that

occurred during the excursion involving cruise line passengers (among other information).  Thus, before Plaintiff and the Decedent's incident, Carnival was or should have been on notice that cruise ship passengers were injured participating in these types of excursions.  Further, Carnival's yearly inspections and/or approval process, including taking the subject excursion under the same or similar circumstances as the subject incident, did or should have revealed that the subject excursion was dangerous and/or not suitable for passengers due to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.

56. Lastly, prior to offering the subject excursion to Plaintiff, Carnival did not know the identity or competency of the shore excursion personnel the Excursion Entities employed for the subject excursion on the day of the subject incident. As such, Carnival failed to reasonably investigate the shore excursion provider, despite Carnival's representation that it "hand select[s] the best local providers at every port of call". *See Perry v. HAL Antillen NV*, 2013 WL 2099499 (W.D. Wash 2013) (denying summary judgment on a negligent selection claim because the cruise line did not know of the subcontractor who the excursion operator employed to transport shore excursion participants; despite the cruise line's representation that it had "take[n] steps to identify and contract with reputable tour operators").

## COUNT I – MISLEADING ADVERTISING IN VIOLATION OF FLORIDA STATUTE § 817.41 AGAINST DEFENDANTS

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

57. On or about on or about October 12, 2021, Plaintiff and the Decedent reviewed Carnival's website prior to boarding the vessel, including the information set forth in paragraphs

18-27 above.  Then, shortly after boarding the vessel on or about October 10, 2021, Plaintiff and the Decedent visited the shore excursion desk aboard the vessel and reviewed Carnival's shore excursion brochure, including page 2 of the brochure, which contained the information set forth in paragraph 23 above.

58. At all times material hereto, Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff reviewed, contained the statements and descriptions set forth in paragraphs 18-27 above.

59. At all times material hereto, Carnival's oral representations and Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff reviewed, contained misrepresentations of material facts, including:

   a. Carnival's oral representations to Plaintiff and the Decedent that the subject excursion was "safe"; when in reality, the excursion was not "safe" because: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities;

   b. Carnival's oral representations to Plaintiff and the Decedent that "this is just our beach trip excursion"; when in reality, Carnival did not operate the subject excursion and/or did not have any Carnival employees "on scene";

   c. Carnival's oral representations to Plaintiff that if they purchased the subject excursion from Carnival, "we have people on scene to look out for you"; when in reality, Carnival did not have people "look out for" Plaintiff and the Decedent because: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities;

   d. Misrepresenting that the activity level for the subject excursion was easy; when in reality, the subject excursion was not easy because all shore excursion participants at the actual excursion on the date of the subject incident who accepted Carnival and/or the Excursion Entities invitation to swim in the beach water encountered dangerous current; and/or

e.   Misrepresenting the Carnival's excursions are "guided," as alleged in paragraph 23(d), when the tour guides did not actually provide sufficient supervision and/or assistance, as alleged in paragraphs 36-43; and/or

f.   Misrepresenting that the excursion providers are safe, reliable and/or reputable, as alleged in paragraph 23(d), when in actuality, the subject excursion was not reasonable safe, for reasons alleged in paragraphs 36-43, and/or passengers' comments, complaints or information concerning safety concerns and/or prior incidents are censored, altered and/or deleted on publicly available website(s) operated and/or controlled by Carnival; and/or

g.   Representing and/or implying that excursion providers would be subject to personal jurisdiction in the United States and/or subject to United States and/or Florida law by contractually requiring all Carnival passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise (including incidents that occur while participating in shore excursions), pursuant to its ticket contract, and/or advertising that its excursion providers are insured, as alleged in paragraph 30(e), when in actuality, excursion entities (including the Excursion Entities) challenge this Court's personal jurisdiction.

60. Pursuant to Florida Statute § 817.41(4), Carnival as well as the Excursion Entities are responsible for the foregoing false and/or misleading advertisements because Defendants were named in and/or obtained the benefits of the statements and/or advertisements which Carnival distributed from its headquarters in Miami, Florida, U.S.A.

61. At all times material hereto, the foregoing statements Carnival made and/or disseminated were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be false and/or misleading.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions.

62. At all times material hereto, the statements were so made or disseminated with the intent or purpose, either directly or indirectly, of inducing passengers (including Plaintiff and the Decedent) to rely on the statements and act by purchasing tickets for shore excursions (including the subject excursion), as evident in the photographs included in paragraphs 22 and 31-35.

63. At all times material hereto, the Plaintiff and the Decedent justifiably relied on the representations made by Carnival when Plaintiff and the Decedent purchased tickets for the subject excursion and participated in the subject excursion. The Plaintiff and the Decedent's reliance on Carnival's representations was justified considering that Plaintiff and the Decedent were residents of Massachusetts, and Carnival was in the business of offering shore excursions to thousands of passengers daily from which it earned tens of millions of dollars a year (or more).  As a result, Carnival was in a much stronger position to identify the potential dangers and/or inequities that passengers (like Plaintiff) will encounter when participating in excursions and/or when involved in incident(s) and/or dispute(s) with excursion providers. The Plaintiff and the Decedent therefore justifiably relied on Carnival to accurately advise Plaintiff concerning the excursion providers and/or the subject excursion as alleged in paragraphs 22 and 31-35.  The Plaintiff and the Decedent's reliance on Carnival's representations was also justified because Carnival made all arrangements for the subject excursion; Carnival marketed the subject excursion using its company logo; Carnival recommended its passengers to not engage in excursions, tours and/or activities that are not sold through Carnival; and/or Plaintiff's exclusive contacts concerning the subject excursion was with Carnival and/or Carnival's onboard excursion desk until the point that Plaintiff and the Decedent actually participated in the subject excursion. Further, had Carnival not made the foregoing representations, the Plaintiff and the Decedent would have made a different decision, such as not participating in the subject excursion if it was not actually operated by Carnival.

64. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

### COUNT II – NEGLIGENT MISREPRESENTATION AGAINST CARNIVAL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

65. On or about on or about October 12, 2021, Plaintiff and the Decedent reviewed Carnival's website prior to boarding the vessel, including the information set forth in paragraphs 18-27 above. Then, shortly after boarding the vessel on or about October 10, 2021, Plaintiff and the Decedent visited the shore excursion desk aboard the vessel and reviewed Carnival's shore excursion brochure, including page 2 of the brochure, which contained the information set forth in paragraph 23 above.

66. At all times material hereto, Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff reviewed, contained the statements and descriptions set forth in paragraphs 18-27 above.

67. At all times material hereto, Carnival's oral representations and Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff reviewed, contained misrepresentations of material facts, including:

a. Carnival's oral representations to Plaintiff and the Decedent that the subject excursion was "safe"; when in reality, the excursion was not "safe" because: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities;

b. Carnival's oral representations to Plaintiff and the Decedent that "this is just our beach trip excursion"; when in reality, Carnival did not operate the subject excursion and/or did not have any Carnival employees "on scene";

c. Carnival's oral representations to Plaintiff that if they purchased the subject excursion from Carnival, "we have people on scene to look out for you"; when in reality, Carnival did not have people "look out for" Plaintiff and the Decedent because: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities;

d. Misrepresenting that the activity level for the subject excursion was easy; when in reality, the subject excursion was not easy because all shore excursion participants at the actual excursion on the date of the subject incident who accepted Carnival and/or the Excursion Entities invitation to swim in the beach water encountered dangerous current; and/or

e. Misrepresenting the Carnival's excursions are "guided," as alleged in paragraph 23(d), when the tour guides did not actually provide sufficient supervision and/or assistance, as alleged in paragraphs 36-43; and/or

f. Misrepresenting that the excursion providers are safe, reliable and/or reputable, as alleged in paragraph 23(d), when in actuality, the subject excursion was not reasonable safe, for reasons alleged in paragraphs 36-43, and/or passengers' comments, complaints or information concerning safety concerns and/or prior incidents are censored, altered and/or deleted on publicly available website(s) operated and/or controlled by Carnival; and/or

g. Representing and/or implying that excursion providers would be subject to personal jurisdiction in the United States and/or subject to United States and/or Florida law by contractually requiring all Carnival passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise

(including incidents that occur while participating in shore excursions), pursuant to its ticket contract, and/or advertising that its excursion providers are insured, as alleged in paragraph 30(e), when in actuality, excursion entities (including the Excursion Entities) challenge this Court's personal jurisdiction.

68. At all times material hereto, the foregoing statements Carnival made and/or disseminated were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be false and/or misleading.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged in paragraphs 28-30 and 44-56.

69. At all times material hereto, the statements were so made or disseminated with the intent or purpose, either directly or indirectly, of inducing passengers (including Plaintiff and the Decedent) to rely on the statements and act by purchasing tickets for shore excursions (including the subject excursion), as evident in the photographs included in paragraphs 22 and 31-35.

70. At all times material hereto, the Plaintiff and the Decedent justifiably relied on the representations made by Carnival when Plaintiff and the Decedent purchased tickets for the subject excursion and participated in the subject excursion. The Plaintiff and the Decedent's reliance on Carnival's representations was justified considering that Plaintiff and the Decedent were residents of Massachusetts, and Carnival was in the business of offering shore excursions to thousands of passengers daily from which it earned tens of millions of dollars a year (or more).  As a result, Carnival was in a much stronger position to identify the potential dangers and/or inequities that

passengers (like Plaintiff) will encounter when participating in excursions and/or when involved in incident(s) and/or dispute(s) with excursion providers. The Plaintiff and the Decedent therefore justifiably relied on Carnival to accurately advise Plaintiff concerning the excursion providers and/or the subject excursion as alleged in paragraphs 22 and 31-35.  The Plaintiff and the Decedent's reliance on Carnival's representations was also justified because Carnival made all arrangements for the subject excursion; Carnival marketed the subject excursion using its company logo; Carnival recommended its passengers to not engage in excursions, tours and/or activities that are not sold through Carnival; and/or Plaintiff's exclusive contacts concerning the subject excursion was with Carnival and/or Carnival's onboard excursion desk until the point that Plaintiff and the Decedent actually participated in the subject excursion. Further, had Carnival not made the foregoing representations, the Plaintiff and the Decedent would have made a different decision, such as not participating in the subject excursion if it was not actually operated by Carnival.

71. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

    a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

    b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

**COUNT III – NEGLIGENT SELECTION AND/OR RETENTION AGAINST CARNIVAL**

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

72. At all times material hereto, it was the duty of Carnival to provide Plaintiff and the Decedent with reasonable care under the circumstances.

73. At all times material hereto, Carnival had a duty to select and/or hire competent and/or fit excursion operators.

74. At all times material hereto, as part of its duty to select and/or hire competent and/or fit excursion operators, it was incumbent on Carnival to diligently inquire into the Excursion Entities' identity, competency and fitness, including that of their employees and/or subcontractors.

75. On or about October 12, 2021, Carnival and/or its agents, servants, joint venturers and/or employees breached its duty to provide Plaintiff and the Decedent with reasonable care under the circumstances by selecting and/or retaining the Excursion Entities, which were incompetent and/or unfit based on the following:

    a.  The failure of the Excursion Entities to provide a reasonably safe excursion; and/or

    b.  The failure to identify the "boots on the ground shore excursion operators, their qualifications and/or competencies;

    c.  The failure of the Excursion Entities to recognize the strong current at the beach;

    d.  The failure of the Excursion Entities to provide look-outs and/or lifeguards for the subject excursion;

    e.  The failure of the Excursion Entities to provide life vests;

    f.  The failure of the Excursion Entities to provide a safe amount of employees in connection with the number of shore excursion participants;

    g.  The failure of the Excursion Entities to have properly trained and supervised persons operating the subject excursion and/or assisting passengers during the excursion; and/or

h.  The failure of the Excursion Entities to adequately inspect the beach cove used for the subject excursion so as to identify its natural hazards.

76. At all times material hereto, Carnival knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged in paragraphs 28-30 and 44-56.

77. As a direct and proximate result of the Excursion Entities' incompetence and/or unfitness, Thomas Lafountain died, and Plaintiff was injured and suffered severe mental distress while participating in the subject shore excursion due to conditions that include, but were not limited to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.  These factors caused and/or contributed to the Thomas Lafountain's death and the living Plaintiff's emotional injuries, and therefore, the subject incident would not have occurred but for Carnival and/or the Excursion Entities' incompetence and/or unfitness.

78. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

    a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

    b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

### COUNT IV – NEGLIGENT FAILURE TO WARN AGAINST CARNIVAL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

79. At all times material hereto, it was the duty of Carnival to provide Plaintiff and the Decedent with reasonable care under the circumstances.

80. At all times material hereto, it was the duty of Carnival to warn passengers (like Plaintiff and the Decedent) of dangers that were known, or reasonably should have been known, to Carnival in places where passengers (like Plaintiff and the Decedent) are invited to or may reasonably be expected to visit beyond the point of disembarkation.

81. On or about October 12, 2021, the Plaintiff and the Decedent were participating in the subject excursion, which Carnival invited and reasonably expected Plaintiff and the Decedent to participate in since Carnival sold them tickets for the excursion.

82. On or about October 12, 2021, Carnival and/or its agents, servants, joint venturers and/or employees breached its duty to warn the Plaintiff and the Decedent through the following acts and/or omissions:

    a.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) of the dangers associated with participating in the subject excursion; and/or

    b.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) of the strong current at the beach cove;

    c.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) that the Excursion Entities would not provide look-outs and/or lifeguards for the subject excursion;

    d.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) that the Excursion Entities would not provide life vests;

    e.  Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that Carnival does not adequately inspect the scene used for the subject excursion, despite the subject excursion being promoted as "hand selected" by Carnival; and/or

    f.  Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that Carnival does not verify that the subject excursion and/or the equipment used for the excursion is/are reasonably safe and/or inspected, despite the subject excursion being promoted as "hand selected" by Carnival; and/or

    g.  Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that the Excursion Entities are not adhering to highest safety standards in the industry, as evident by the hazard and/or incompetence involved with the subject excursion; and/or

    h.  Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that the Excursion Entities are not subject to jurisdiction in the United States, especially when Carnival contractually requires its passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise (including incidents that occur while participating in shore excursions); and/or

    i.  Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that the Excursion Entities carry independent insurance from the cruise line that has lower limits and more limited coverage than Carnival's insurance.

83. The above acts and/or omissions caused and/or contributed to Thomas Lafountain's death and the living Plaintiff injuries because Plaintiff and the Decedent would not have purchased tickets for and/or participated in the subject excursion had Carnival and/or its agents, servants, and/or employees adequately warned and/or communicated the foregoing to the Plaintiff and the Decedent.

84. At all times material hereto, Carnival knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged in paragraphs 28-30 and 44-56.

85. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

    a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

    b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's

earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

### COUNT V – GENERAL NEGLIGENCE AGAINST CARNIVAL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

86. At all times material hereto, it was the duty of Carnival to provide Plaintiff and the Decedent with reasonable or ordinary care under the circumstances.

87. On or about October 12, 2021, Carnival and/or its agents, servants, joint venturers and/or employees breached its duty to provide Plaintiff and the Decedent with reasonable or ordinary care under the circumstances, based on the following acts and/or omissions:

   a. Failure to cancel the subject excursion in light of the strong rip current at the subject beach;

   b. Failure to provide a reasonably safe excursion; and/or

   c. Failure to recognize the strong current at the beach cove;

   d. Failure to provide look-outs and/or lifeguards for the subject excursion;

   e. Failure to provide life vests for the subject excursion;

   a. Promoting the subject excursion as "hand selected" by Carnival, thereby implying the excursion's vessel(s) and/or operations were reasonably safe under the circumstances, when in fact they were not; and/or

   b. Censoring, altering and/or deleting comments on publicly available website(s) operated and/or controlled by Carnival so as to censor, alter and/or delete complaints or information concerning safety concerns and prior incidents similar to the subject incident, thereby implying that the subject excursion, the Excursion Entities and/or their operations were reasonably safe under the circumstances, when in fact they were not; and/or

     c.   Failure to adequately inspect and/or monitor excursion providers so as to ensure that the subject excursion was reasonably safe for passengers; and/or

     d.   Failure to promulgate and/or enforce adequate standards, policies, and/or procedures for the Excursion Entities to require tour guides to adequately and/or regularly inspect, monitor and/or clean the excursion vessel's flooring surface to maintain it in a clean and dry condition as passengers boarded and/or walked around the vessel after swimming and/or visiting the beach; and/or

     e.   Failure to regularly and/or adequately identify the highest safety standards in the industry for the activities offered in the subject excursion, and verify that the Excursion Entities are adhering to such standards; and/or

     f.   Failure to regularly and/or adequately review the safety record of the Excursion Entities before recommending the subject excursion to passengers and the Plaintiff.

88. All or some of the above acts and/or omissions by Carnival and/or its agents, servants, and/or employees, caused and/or contributed to Thomas Lafountain's death and the living Plaintiffs' injuries while participating in the subject excursion.

89. At all times material hereto, Carnival knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 28-30 and 44-56; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged in paragraphs 28-30 and 44-56.

90. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

    a.  Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

    b.  Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

## COUNT VI – GENERAL NEGLIGENCE AGAINST THE EXCURSION ENTITIES

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

91. At all times material hereto, the Excursion Entities owned and/or operated the subject excursion.

92. At all times material hereto, it was the duty of the Excursion Entities to provide Plaintiff and the Decedent with reasonable care under the circumstances.

93. On or about October 12, 2021, the Excursion Entities and/or their agents, servants, and/or employees breached their duty to provide Plaintiff and the Decedent with reasonable care under the circumstances, based on the following acts and/or omissions:

    a.  Failure to cancel the subject excursion in light of the strong rip current at the subject beach;

    b.  Failure to provide a reasonably safe excursion; and/or

    c.  Failure to recognize the strong current at the beach cove;

    d.  Failure to provide look-outs and/or lifeguards for the subject excursion;

    e.  Failure to provide life vests for the subject excursion;

    f.  Failure to adequately inspect and/or monitor excursion provider employees and/or the scene of the subject excursion so as to ensure that the subject excursion was reasonably safe for passengers; and/or

    g.  Failure to regularly and/or adequately identify the highest safety standards in the industry for the activities offered in the subject excursion, and verify that the Excursion Entities are adhering to such standards; and/or

    h.  Failure to ensure that properly trained and supervised persons operated the subject excursion; and/or

    i.  Having a shore excursion that was not competently operated.

94. All or some of the above acts and/or omissions by the Excursion Entities and/or their agents, servants, and/or employees, caused and/or contributed to Thomas Lafountain's death and the living Plaintiff's injuries while participating in the subject excursion.

95. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

    a.  Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

    b.  Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demand judgment for all damages recoverable under the law and demand trial by jury.

## COUNT VII – NEGLIGENT FAILURE TO
## WARN AGAINST THE EXCURSION ENTITIES

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

96. At all times material hereto, it was the duty of the Excursion Entities to provide Plaintiff with reasonable care under the circumstances.

97. At all times material hereto, it was the duty of the Excursion Entities to warn passengers (like Plaintiff and the Decedent) of dangers that were known, or reasonably should have been known, to the Excursion Entities in places where passengers (like Plaintiff and the Decedent) are invited to or may reasonably be expected to visit beyond the point of disembarkation.

98. On or about October 12, 2021, the Plaintiff and the Decedent were participating in the subject excursion, which the Excursion Entities invited and reasonably expected Plaintiff and the Decedent to participate in since Carnival contracted with the Excursion Entities to operate the excursion and sold Plaintiff and the Decedent the ticket for the excursion to take place on October 12, 2021.

99. On or about October 12, 2021, the Excursion Entities and/or its agents, servants, joint venturers and/or employees breached its duty to warn the Plaintiff and the Decedent through the following acts and/or omissions:

    a.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) of the dangers associated with participating in the subject excursion; and/or

    b.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) of the strong current at the beach cove;

    c.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) that the Excursion Entities would not provide look-outs and/or lifeguards for the subject excursion;

    d.  Failure to adequately warn passengers (including the Plaintiff and the Decedent) that the Excursion Entities would not provide life vests; and/or

e. Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that Carnival does not verify that the subject excursion and/or the equipment used for the excursion is/are reasonably safe and/or inspected, despite the subject excursion being promoted as "hand selected" by Carnival; and/or

f. Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that the Excursion Entities carry independent insurance from the cruise line that has lower limits and more limited coverage than Carnival's insurance.

g. Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that the Excursion Entities are not subject to jurisdiction in the United States, especially when Carnival contractually requires its passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise (including incidents that occur while participating in shore excursions); and/or

h. Failure to adequately warn and/or communicate to passengers (including the Plaintiff) the limits of the Excursion Entities' insurance.

100.    The above acts and/or omissions caused and/or contributed to Thomas Lafountain's death and the living Plaintiff's injuries while participating in the subject excursion because Plaintiff and the Decedent would not have purchased tickets for and/or participated in the subject excursion had the Excursion Entities and/or its agents, servants, and/or employees adequately warned and/or communicated the foregoing to them.

101.    As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in

nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

## COUNT VIII – NEGLIGENCE AGAINST DEFENDANTS
## BASED ON APPARENT AGENCY OR AGENCY BY ESTOPPEL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

102.    At all times material hereto, the Excursion Entities were the apparent agent(s) of Carnival.

103.    At all times material hereto, Carnival is estopped to deny that the Excursion Entities were their agent(s) or employee(s).

104.    At all times material hereto, Carnival made manifestations which caused the Plaintiff to believe that the Excursion Entities had authority to act for the benefit of Carnival. These manifestations included:

    a.  Carnival allowed its name to be utilized in connection with the advertising of the Excursion Entities; and/or

    b.  Carnival made all arrangements for the subject excursion without effectively disclosing to the Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

    c.  Carnival marketed the subject excursion using its company logo on its website and/or in its brochures and/or on its ship without effectively disclosing to the Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

    d.  Carnival maintained an excursion desk on its ship whereby it offered, sold, provided information to, and answered questions of passengers, including Plaintiff, about the subject excursion without effectively disclosing to the Plaintiff that the subject excursion was being run by another entity (and/or entities); and/or

    e.  Until the point that Plaintiff actually participated in the subject excursion, the Plaintiff' exclusive contacts concerning the subject excursion were with Carnival; and/or

     f.   Carnival recommended to Plaintiff to not engage in excursions, tours or activities that are not sold through Carnival as Carnival has no familiarity with other tours or their operations; and/or

     g.   The fee for the excursion was charged to the Plaintiff, and collected from the Plaintiff, exclusively by Carnival; and/or

     h.   Plaintiff received the receipt for the purchase of the subject excursion exclusively from Carnival.

105.   Plaintiff reasonably relied on the above, to her detriment, so as to believe that the Excursion Entities were the employee(s) and/or agent(s) of Carnival in choosing the subject excursion.

106.   It was reasonable to believe that the Excursion Entities were Carnival's employee(s) and/or agent(s) because the Plaintiff booked, paid for and made all necessary arrangements for the subject excursion with Carnival. Carnival's actions caused Plaintiff to believe that the Excursion Entities had authority to act on Carnival's behalf. At no time did the Excursion Entities represent to the ship's passengers or the Plaintiff in particular in a meaningful way that the Excursion Entities were not agents or employees of Carnival.

107.   Plaintiff' reasonable reliance was detrimental because Plaintiff would not have booked, paid for and/or participated in the subject excursion or incur any injuries had the Plaintiff known that the subject excursion was not operated by Carnival, as alleged in paragraphs 22-43.

108.   The foregoing acts of negligence of Carnival and/or the Excursion Entities were a direct and proximate cause of Thomas Lafountain's death and the living Plaintiff's injuries.

109.   As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

     a.   Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

### COUNT IX – NEGLIGENCE AGAINST DEFENDANTS BASED ON JOINT VENTURE BETWEEN CARNIVAL AND THE EXCURSION ENTITIES

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

110.    At all times material hereto, Carnival and the Excursion Entities engaged in a joint venture to provide excursions to passengers aboard Carnival's ship(s).

111.    At all times material hereto, Carnival and the Excursion Entities entered into an agreement where Carnival would sell the subject excursion to its passengers and the Excursion Entities would operate the subject excursion.

112.    As its part of the joint venture, Carnival arranged for, sponsored, recommended, marketed, operated, marketed, sold and/or collected money for the subject excursion, and the money was then shared between Carnival and the Excursion Entities.  As its part of the joint venture, the Excursion Entities provided labor and/or operated the subject excursion.

113.    Carnival, on behalf of the joint venture, charged a fee to passengers who utilized the excursions.  The fee paid by the passengers, including the Plaintiff, was split between Carnival and the Excursion Entities, such that Carnival and the Excursion Entities shared a profit of the money made from the shore excursion.

114.    At all times material hereto, Carnival and the Excursion Entities had joint and/or shared control over aspects of the joint venture.  The Excursion Entities had control over the day-to-day workings of the excursions. Carnival also had control over the day-to-day workings of the excursions in that they required the Excursion Entities to exercise reasonable care in the operation of the subject excursion. Carnival had control over the arrangements, marketing and sales of the excursion.

115.    At all times material hereto, Carnival and the Excursion Entities shared a common purpose: to operate the subject excursion for a profit.

116.    At all times material hereto, Carnival and the Excursion Entities had a joint proprietary and/or ownership interest in the subject excursion. Carnival had an interest in arranging, sponsoring, recommending, advertising, operating, and selling the subject excursion as well as collecting money for such excursion, and the Excursion Entities had a proprietary interest in the time and labor expended in operating the subject excursion.

117.    At all times material hereto, Carnival and the Excursion Entities shared and/or had the right to share in the profits of the subject excursion, as Carnival retained a portion of the ticket sales for the subject excursion after the tickets were sold, and Carnival paid the Excursion Entities the remaining portion of the ticket sales for the subject excursion.

118.    At all times material hereto, Carnival and the Excursion Entities shared and/or had a duty to share any losses that may have been sustained with the subject excursion, including, for instance, when Carnival issued a refund to passengers for the Excursion Entities' excursion(s), including, but not limited to, the subject excursion.

119.    Carnival and the Excursion Entities are jointly and severally responsible for each other's negligence as partners of the partnership and/or joint venture.

120.    At all times material hereto, Carnival and the Excursion Entities therefore:

    a. Had an intention to create a joint venture;

    b. Had a joint proprietary interest in the subject matter of the venture;

    c. Had mutual control and/or joint control over the subject matter of the venture with respect to the provision of excursions to passengers aboard the ship;

    d. Had a right to share in the profits of the joint venture; and

    e. Would share losses which may have been sustained.

121. As joint venturers, Carnival and the Excursion Entities are liable for each other's negligence. As a result, Carnival is liable for the negligent conduct of the Excursion Entities.

122. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

    a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

    b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

## COUNT X – THIRD-PARTY BENEFICIARY

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

123. Carnival and the Excursion Entities entered into a contract to provide the subject excursion for passengers aboard Carnival's ship(s).

124. Carnival and the Excursion Entities intended that the contract primarily and directly benefit Carnival's passengers, including the Plaintiff and the Decedent.

125. The intent of Carnival and the Excursion Entities for the contract to benefit Carnival passengers, including the Plaintiff and the Decedent, was expressed by Carnival and the Excursion Entities.

126. The intent of Carnival and the Excursion Entities for the contract to benefit Carnival passengers, including the Plaintiff and the Decedent, was demonstrated by the provisions of the contract.  These provisions include, but are not limited to, the following: (a) the purpose of the agreement explicitly stating that it is for the Excursion Entities to provide shore excursions to guests on Carnival's vessels; (b) prohibiting dangerous activities from forming any part of shore excursions; (c) Carnival having the right to charge its passengers the price that Carnival determines in its sole discretion; (d) Carnival having the sole discretion to provide its passengers a full or partial reimbursement of the excursion ticket if a passenger is dissatisfied; (e) Carnival requiring that the Excursion Entities exercise reasonable care for the passengers' safety at all times; (f) Carnival requiring that the Excursion Entities satisfy and continue to satisfy the highest standards of quality in the industry; and/or (g) Carnival requiring that the Excursion Entities maintain insurance for any and all injuries to passengers.

127. This contract was breached by Carnival and/or the Excursion Entities (and/or their agents, servants, joint venturers and/or employees) by failing to offer a reasonably safe excursion that satisfied the highest standards of quality in the industry (as required under the contract), based on the hazards involved with the subject excursion, including, but not limited to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan

promulgated by Carnival and/or the Excursion Entities.  Thomas Lafountain would not have died and the living Plaintiff would not have been injured but for Defendants failing to offer a reasonably safe excursion that satisfied the highest standards of quality in the industry (as required under the contract).

128.     As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

   a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

   b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

## COUNT XI – BREACH OF NON-DELEGABLE DUTY AGAINST CARNIVAL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through fifty-six (56) as though alleged originally herein.

129.     Carnival contractually offered to provide Plaintiff the subject shore excursion. In connection with Carnival's offer, Carnival's shore excursion agent made oral representations concerning the shore excursion, as outlined at paragraph 21 and paragraphs 18-35. The Plaintiff accepted that contractual offer in reliance upon Carnival's advertisements and oral representations, and provided consideration to Carnival by purchasing the excursion from Carnival.

130.  By making representations, promoting, vouching for, contracting for and profiting from the excursion ticket contract, Carnival owed Plaintiff the non-delegable contractual duty to provide them with a reasonably safe excursion. *See, e.g., Bailey v. Carnival Corp.*, 369 F. Supp. 3d 1302 (S.D. Fla. 2019); *see also Witover v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139 (S.D. Fla. 2016).

131.  Carnival breached its non-delegable contractual and/or tort duty to provide a reasonably safe excursion by committing one or more of the following acts:

a.  Carnival's oral representations to Plaintiff and the Decedent that the subject excursion was "safe"; when in reality, the excursion was not "safe" because: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities;

b.  Carnival's oral representations to Plaintiff and the Decedent that "this is just our beach trip excursion"; when in reality, Carnival did not operate the subject excursion and/or did not have any Carnival employees "on scene";

c.  Carnival's oral representations to Plaintiff that if they purchased the subject excursion from Carnival, "we have people on scene to look out for you"; when in reality, Carnival did not have people "look out for" Plaintiff and the Decedent because: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities;

d.  Misrepresenting that the activity level for the subject excursion was easy; when in reality, the subject excursion was not easy because all shore excursion participants at the actual excursion on the date of the subject incident who accepted Carnival and/or the Excursion Entities invitation to swim in the beach water encountered dangerous current; and/or

e.  Misrepresenting the Carnival's excursions are "guided," as alleged in paragraph 23(d), when the tour guides did not actually provide sufficient supervision and/or assistance, as alleged in paragraphs 36-43; and/or

f.  Misrepresenting that the excursion providers are safe, reliable and/or reputable, as alleged in paragraph 23(d), when in actuality, the subject excursion was not reasonable safe, for reasons alleged in paragraphs 36-43, and/or passengers' comments, complaints or information concerning safety concerns and/or prior incidents are

censored, altered and/or deleted on publicly available website(s) operated and/or controlled by Carnival;

g. Failing to select and adequately verify that the Excursion Entities and the subject excursion were safe, reliable and reputable, as evident by how unreasonably dangerous the subject excursion was; and/or

h. Failing to offer a reasonably safe excursion, as evident by how unreasonably dangerous the subject excursion was; and/or

i. Failure to recognize the strong current at the beach cove;

j. Failure to provide look-outs and/or lifeguards for the subject excursion;

k. Failure to provide life vests for the subject; and/or

132. As a direct result of the foregoing dangerous conditions to which Plaintiff and the Decedent were exposed:

a. Thomas Lafountain died; and as a result, his beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Thomas Lafountain's financial contributions, lost Thomas Lafountain's household support; and lost, among other available category of damages, Thomas Lafountain's love, guidance and support;

b. Plaintiff suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to, gastrointestinal pain, poor sleep, and lack of appetite. The Plaintiff also incurred medical expenses for psychological treatment. The Plaintiff's earning capacity has been impaired; and the adult Plaintiff lost wages she would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law and demand trial by jury.

Respectfully submitted,

By: */s/ Jason R. Margulies*
    **JASON R. MARGULIES** (FBN 57916)
    jmargulies@lipcon.com
    **JACQUELINE GARCELL** (FBN 104358)
    jgarcell@lipcon.com
    **L. ALEX PEREZ** (FBN 125452)
    aperez@lipcon.com

LIPCON, MARGULIES
& WINKLEMAN, P.A.
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone No.: (305) 373-3016
Facsimile No.: (305) 373-6204
*Attorneys for Plaintiff*